**UNITED STATES COURT OF INTERNATIONAL TRADE**

**BEFORE: THE HONORABLE GARY S. KATZMANN, JUDGE**

| | |
|---|---|
| ECOPURE SPECIALTIES LTD.,<br>Plaintiff,<br>v.<br>UNITED STATES,<br>Defendant,<br>and<br>ORGANIC SOYBEAN PROCESSORS OF AMERICA,<br>Defendant-Intervenor. | Court No. 26-2529 |

**ORDER**

Upon consideration of the Motion for Judgment on the Agency Record and the accompanying Memorandum of Law filed pursuant to Rule 56.2 of the Rules of the United States Court of International Trade by Plaintiff Ecopure Specialties Limited ("Ecopure") and upon consideration of all other papers and proceedings herein, it is hereby

**ORDERED** that Plaintiff's Motion is **GRANTED**; and it is further

**ORDERED** that the U.S. Department of Commerce's ("Commerce") Final Results of the second annual administrative review of the countervailing duty ("CVD") Order on organic soybean meal from India (Case No. C-533-902) published as *Organic Soybean Meal From India: Final Results of Countervailing Duty Administrative Review*; 2023, 91 Fed. Reg. 9551 (Feb. 26, 2026) ("Final Results"), are not supported by substantial evidence on the record and are otherwise not in accordance with law; and it is further

**ORDERED** that the Final Results are remanded to Commerce with instructions to

recalculate the CVD rate assigned to Ecopure; and it is further

**ORDERED** that Commerce shall file with the Court and provide to the parties a remand redetermination within 90 days of the date of this order; thereafter, the parties shall have 30 days to submit comments to the Court opposing the remand redetermination and the parties shall have 30 days thereafter to file reply comments supporting the remand redetermination.

**SO ORDERED**.

__________________________________
Gary S. Katzmann, Judge

Dated: ____________________________
New York, New York

**UNITED STATES COURT OF INTERNATIONAL TRADE**

**BEFORE: THE HONORABLE GARY S. KATZMANN, JUDGE**

| | | |
|---|---|---|
| ECOPURE SPECIALTIES LTD., Plaintiff, v. UNITED STATES, Defendant, and ORGANIC SOYBEAN PROCESSORS OF AMERICA, Defendant-Intervenor. | : | Court No. 26-2529 |

**<u>PLAINTIFFS' MOTION FOR JUDGMENT ON THE AGENCY RECORD PURSUANT TO RULE 56.2</u>**

Pursuant to Rule 56.2 of the Rules of this Court, Plaintiff Ecopure Specialties Limited ("Ecopure") respectfully moves for judgment on the agency record. Ecopure challenges the U.S. Department of Commerce's ("Commerce") Final Results of the second annual administrative review of the countervailing duty ("CVD") Order on organic soybean meal from India (Case No. C-533-902) published as *Organic Soybean Meal From India: Final Results of Countervailing Duty Administrative Review; 2023*, 91 Fed. Reg. 9551 (Feb. 26, 2026) ("Final Results"). As demonstrated in the attached Memorandum of Law, the Final Results are not supported by substantial evidence on the record and are otherwise not in accordance with law.

Ecopure requests that this Court remand this matter to Commerce with instructions to recalculate its CVD rate. The legal and factual support for Plaintiff's Motion for Judgment on the Agency Record are detailed in the attached Memorandum of Law.

Respectfully submitted,


*/s/ Ned H. Marshak*
Ned H. Marshak*
Dharmendra N. Choudhary
Andrew T. Schutz

GRUNFELD, DESIDERIO, LEBOWITZ,
SILVERMAN & KLESTADT LLP

1201 New York Ave., NW, Suite 650
Washington, DC 20005
(202) 783-6881

*599 Lexington Ave., 36th Floor
New York, NY 10022
(212) 557-4000

*Counsel for Plaintiff*
*Ecopure Specialties Ltd.*


Dated: October 30, 2026

**UNITED STATES COURT OF INTERNATIONAL TRADE**

**BEFORE: THE HONORABLE GARY S. KATZMANN, JUDGE**

| | | |
|---|---|---|
| ECOPURE SPECIALTIES LTD., Plaintiff, | : | Court No. 26-2529 |
| v. | : | **PUBLIC VERSION** |
| UNITED STATES, Defendant, | : | |
| and | : | |
| ORGANIC SOYBEAN PROCESSORS OF AMERICA, Defendant-Intervenor. | : | |

**MEMORANDUM OF LAW IN SUPPORT OF PLAINTIFF'S MOTION FOR JUDGMENT ON THE AGENCY RECORD PURSUANT TO USCIT RULE 56.2**

Ned H. Marshak*
Dharmendra N. Choudhary
Andrew T. Schutz

GRUNFELD, DESIDERIO, LEBOWITZ, SILVERMAN & KLESTADT LLP

1201 New York Ave., NW, Suite 650
Washington, DC 20005

*599 Lexington Ave., 36th Floor
New York, NY 10022
(212) 557-4000

*Counsel for Plaintiff*
*Ecopure Specialties Ltd.*

Dated: October 30, 2026

# TABLE OF CONTENTS


STATEMENT PURSUANT TO USCIT RULE 56.2 .......... 1

A. Administrative Determination Subject to Appeal .......... 1

B. Issues of Law and Summary of Argument .......... 1

1. Whether There Is A Gap In The Record .......... 2

2. Whether Ecopure's Failure To Disclose All Affiliates In Its Initial Submission Justifies Relying On Total AFA .......... 3

3. Whether Commerce's Decision That Ecopure's Submissions Were Unreliable Was Supported By Substantial Evidence .......... 3

4. Whether 19 U.S.C. § 1677m(d), Which Prohibits Commerce From Relying On Total AFA Without Providing Ecopure With The Opportunity To Cure The Deficiencies Upon Which Commerce Relied, Applies To This Case .......... 5

5. Whether Ecopure's Errors Were Sufficiently Egregious To Allow Commerce To Rely on the Extraordinary Remedy Of Total AFA .......... 5

6. Whether Commerce Departed From Its Established Practice And Without Adequate Explanation Treated Ecopure Differently From Other Respondents in other Cases, and Tejawat in this Case .......... 6

C. Reasons for Contesting the Determination .......... 7

STANDARD OF REVIEW .......... 7

STATEMENT OF FACTS .......... 8

ARGUMENT .......... 17

I. THERE IS NO GAP IN THE RECORD; THUS, RELYING ON AFA WAS CONTRARY TO LAW .......... 18

II. COMMERCE CANNOT RELY ON TOTAL AFA MERELY BECAUSE ECOPURE FAILED TO DISCLOSE ALL AFFILIATES IN ITS INITIAL OCTOBER 15, 2024, SUBMISSION .......... 22

III. COMMERCE'S DECISION THAT ECOPURE'S SUBMISSIONS WERE UNRELIABLE WAS NOT SUPPORTED BY SUBSTANTIAL EVIDENCE .......... 26

IV. 19 U.S.C. § 1677m(d) PROHIBITS COMMERCE FROM RELYING ON TOTAL AFA WITHOUT PROVIDING ECOPURE WITH THE OPPORTUNITY TO CURE THE DEFICIENCIES UPON WHICH COMMERCE RELIED .......... 31

V. ECOPURE'S ERRORS WERE NOT SUFFICIENTLY EGREGIOUS TO ALLOW COMMERCE TO RELY ON THE EXTRAORDINARY REMEDY OF TOTAL AFA.. 34

VI. COMMERCE DEPARTED FROM ITS ESTABLISHED PRACTICE AND ALSO TREATED ECOPURE DIFFERENTLY FROM TEJAWAT WITHOUT ADEQUATE EXPLANATION ........ 38

CONCLUSION........ 41

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*AG Der Dillinger Huttenwerke v. United States*,
140 F.4th 1364 (Fed. Cir. 2025) ....................36

*China Steel Corp. v. United States*,
393 F. Supp. 3d 1322 (CIT 2019) ....................34, 35

*Consol. Edison Co. v. NLRB*,
305 U.S. 197 (1938) ....................7

*Dalian Meisen Woodworking Co. v. United States*,
788 F. Supp. 3d 1354 (CIT 2025) ....................18

*Dillinger France S.A. v. United States*,
350 F. Supp. 3d 1349 (CIT 2018) ....................18, 36

*Fine Furniture (Shanghai) Ltd. v. United States*,
865 F. Supp. 2d 1254 (CIT 2012) ....................24, 25

*Fujian Machinery & Equipment Import & Export Corp. v. United States*,
178 F. Supp. 2d 1305 (CIT 2001) ....................35, 36, 38

*Gerald Metals, Inc. v. United States*,
132 F.3d 716 (Fed. Cir. 1997) ....................7

*Grobest & I-Mei Indus. (Vietnam) Co. v. United States*,
815 F. Supp. 2d 1342 (CIT 2012) ....................23, 25

*Grupo Acerero S.A. de C.V. v. United States*,
698 F. Supp. 3d 1320 (CIT 2024) ....................39, 40

*Hitachi Energy USA Inc. v. United States*,
34 F.4th 1375 (Fed. Cir. 2022) ....................32, 33

*Hyundai Elec. & Energy Sys. v. United States*,
No. 2021-2312, 2022 WL 3273811 (Fed. Cir. Aug. 11, 2022) ....................18, 33, 35

*Loper Bright Enters. v. Raimondo*,
144 S. Ct. 2244 (2024) ....................7, 8

*Mannesmannrohren-Werke AG v. United States*,
77 F. Supp. 2d 1302 (CIT 1999) ....................34, 35, 36

*Matsushita Elec. Indus. Co. v. United States*,
750 F.2d 927 (Fed. Cir. 1984)....7

*Motor Vehicle Mfgrs. Ass'n v. State Farm Mut. Auto. Ins. Co.*,
463 U.S. 29 (1983)....7

*Mukand, Ltd. v. United States*,
767 F.3d 1300 (Fed. Cir. 2014)....33, 34

*National Nail Corp. v. United States*,
390 F. Supp. 3d 1356 (CIT 2019 ....34, 36, 37

*Nippon Steel Corp. v. United States*,
146 F. Supp. 2d 835 (CIT 2001)....38

*NSK Ltd. v. United States*,
481 F.3d 1355 (Fed. Cir. 2007)....32

*Nucor Corp. v. United States*,
653 F. Supp. 3d 1295 (CIT 2023)....40

*Pro-Team Coil Nail Enterprise, Inc. v. United States*,
419 F. Supp. 3d 1319 (CIT 2019)....23, 34

*Queen's Flowers de Colombia v. United State*s,
981 F. Supp. 617 (CIT 1997)....32

*Saha Thai Steel Pipe Pub. Co. v. United States*,
605 F. Supp. 3d 1348 (CIT 2022)....32

*Save Domestic Oil, Inc. v. United States*,
357 F.3d 1278 (Fed. Cir. 2004)....8

*Sigma Corp. v. United States*,
841 F. Supp. 1255 (CIT 1993)....32

*SKF USA, Inc. v. United States*,
263 F.3d 1369 (Fed. Cir. 2001)....8, 40

*SKF USA Inc. v. United States*,
35 CIT 1432 (2011)....39

*SKF USA, Inc. v. United States*,
630 F.3d 1365 (Fed. Cir. 2011)....8

*Steel Authority of India, Ltd. v. United States*,
149 F. Supp. 2d 921 (CIT 2001)....34

*Ta Chen Stainless Steel Pipe v. United States*,
No. 97-08-01344, 1999 WL 1001194 (CIT Oct. 28, 1999) .......... 32

*TNC Kazchrome JSC v. United States*,
No. 25-00128, 2026 WL 2668862 (CIT Sept. 10, 2026) .......... 32, 33

*WelCom Prods., Inc. v. United States*,
865 F. Supp. 2d 1340 (CIT 2012) .......... 8

*Yangzhou Bestpak Gifts & Crafts Co. v. United States*,
716 F.3d 1370 (Fed. Cir. 2013) .......... 7

*Zhejiang DunAn Hetian Metal Co. v. United States*,
652 F.3d 1333 (Fed. Cir. 2011) .......... 18, 34, 36, 37

**Regulations**

19 C.F.R. 351.525 .......... *passim*

19 C.F.R. § 351.401 .......... 40

**Rules**

Rules of the United States Court of International Trade Rule 56.2 .......... 1

**Statutes**

19 U.S.C. § 1516 .......... 7

19 U.S.C. § 1677 .......... *passim*

**Other Authorities**

*Ceramic Tile from India: Final Affirmative Countervailing Duty Determination and Final Affirmative Critical Circumstances Determination, in Part*, 90 Fed. Reg. 17,036 (Apr. 23, 2025) .......... 18, 19

*Certain Frozen Fish Fillets from the Socialist Republic of Vietnam: Final Results of the Tenth Antidumping Duty Administrative Review; 2012-2013*, 80 Fed. Reg. 23,945 (Jan. 7, 2015) .......... 29

*Certain Frozen Warmwater Shrimp From the People's Republic of China: Notice of Final Results and Rescission, in Part, of 2004/2006 Antidumping Duty Administrative and New Shipper Reviews*, 72 Fed. Reg. 52,049 (Sep. 12, 2007) .......... 29

*Certain Stainless Steel Butt-Weld Fittings from Taiwan: Final Results and Final Rescission in Part of Antidumping Duty Administrative Review*, 70 Fed. Reg. 1870 (Jan. 11, 2005)....................38

*Countervailing Duties*, 63 Fed. Reg. 65,348 (Nov. 25, 1998)....................19, 20

*Emulsion Styrene-Butadiene Rubber from the Russian Federation: Final Affirmative Determination of Sales at Less than Fair Value and Classification of the Russian Federation as a Non-Market Economy*, 87 Fed. Reg. 69,002 (Nov. 17, 2022)....................38

*Initiation of Antidumping and Countervailing Duty Administrative Reviews*, 89 Fed. Reg. 55,567 (July 5, 2024)....................8

*Monosodium Glutamate From the People's Republic of China: Final Determination of Sales at Less Than Fair Value and the Final Affirmative Determination of Critical Circumstances*, 79 Fed. Reg. 58,326 (Sep. 29, 2014)....................29

*Multilayered Wood Flooring from the People's Republic of China: Final Results of Antidumping Duty Administrative Review, Final Determination of No Shipments, and Final Successor-in-Interest Determination; 2020-2021*, 88 Fed. Reg. 42,293 (June 30, 2023)....................24, 38

*Organic Soybean Meal From India: Preliminary Results and Partial Rescission of Countervailing Duty Administrative Review; 2023*, 90 Fed. Reg. 25,994, 25,995 (June 18, 2025).................... *passim*

*Organic Soybean Meal From India: Final Results of Countervailing Duty Administrative Review; 2023*, 91 Fed. Reg. 9551 (Feb. 26, 2026).................... *passim*

*Organic Soybean Meal from India*, Inv. Nos. 701-TA-667 & 731-TA-1559 (Final), USITC Pub. 5321 (Mar. 2022)....................30

*Xanthan Gum from Austria: Final Determination of Sales at Less Than Fair Value*, 78 Fed. Reg. 33,354 (June 4, 2013)....................25

This Memorandum of Law is filed by Plaintiff Ecopure Specialties Limited ("Ecopure") to support its Motion for Judgment on the Agency Record.

**STATEMENT PURSUANT TO USCIT RULE 56.2**

**A. Administrative Determination Subject to Appeal**

Ecopure seeks judicial review of the U.S. Department of Commerce's ("Commerce" or "Department") Final Results of the second annual administrative review ("AR2") of the countervailing duty ("CVD") Order on Organic Soybean Meal from India, covering the period of review ("POR") January 1, 2023, through December 31, 2023. *Organic Soybean Meal From India: Final Results of Countervailing Duty Administrative Review; 2023*, 91 Fed. Reg. 9551 (Feb. 26, 2026) (**PR 4**) ("Final Results"), and accompanying Issues and Decision Memorandum (Feb. 23, 2026) (**PR 5**) ("IDM").

**B. Issues of Law and Summary of Argument**

In its Final Results, Commerce rejected all information submitted by Ecopure and in its place relied on total adverse facts available ("AFA") at a rate of 75.48%. IDM at 16, 25. Commerce relied on AFA because in its opinion Ecopure "significantly impeded" the proceeding insofar as none of the information submitted by Ecopure was "reliable or usable." *Id*. at 19-20. These findings were based on the facts that in its initial affiliation questionnaire response, submitted on October 15, 2024, Ecopure: (1) did not disclose all of its affiliates; and (2) failed to report that one affiliate had transactions with one of Ecopure's three cross-owned companies. Commerce also reasoned that there was a "strong indication" that another Ecopure affiliate is "indeed involved in the production and/or export of subject merchandise" because it produced merchandise classified in an Harmonized Tariff Schedule ("HTS") subheading that was listed in the CVD Order as a subheading in which subject merchandise is classified. *Id*. at 23. Commerce

concluded that Ecopure's "consistently inconsistent affiliation reporting resulted in an informational gap given the conflicting pieces of evidence with respect to affiliation on the record." *Id*. at 20.

In reaching this conclusion, Commerce either belittled or ignored the facts that: (1) Ecopure cured all defects in its reporting of affiliates in its January 3, 2025, supplemental questionnaire response, filed five and a half months before Commerce's Preliminary Results; (2) Commerce never asked Ecopure to explain any of the information reported by Ecopure on January 3, 2025, notwithstanding issuing two supplemental questionnaires to the second mandatory respondent, Tejawat Organic Foods ("Tejawat"), after that date; (3) Commerce accepted as complete and accurate Ecopure's voluminous, timely filed submissions regarding subsidy programs under review; (4) Ecopure's affiliation reporting was consistent with its financial statements placed on the record on November 22, 2024; and (5) there was not a scintilla of record evidence that Ecopure's January 3, 2025, submission was incomplete or inaccurate.

Application of judicial precedent and Commerce's own administrative practice to the facts and circumstances summarized above, and discussed in detail in this Memorandum of Law, establish that Commerce's reliance on total AFA is not supported by substantial evidence and is contrary to law. The specific issues raised in this Memorandum of Law are set forth below.

**1. Whether There Is A Gap In The Record**

Commerce can only rely on facts otherwise available to fill a gap in the record. In this case, there was no gap. In its January 3, 2025, submission, Ecopure provided Commerce with a corrected, complete, and accurate list of affiliates, and expressly advised Commerce as to the nature of the relationship of these companies with Ecopure, i.e., whether they were cross-owned and whether they were involved in the production and/or sale of subject merchandise. None of

the affiliates reported in the January 3, 2025, submission were cross-owned affiliates within the meaning of 19 C.F.R. 351.525 that would be required to report subsidies. This being the case, Commerce's decision to rely on facts available is contrary to law, which means that its decision to rely on total AFA also is contrary to law.

**2. Whether Ecopure's Failure To Disclose All Affiliates In Its Initial Submission Justifies Relying On Total AFA**

Commerce's decision to rely on total AFA was in large part based on its subsidiary conclusion that Ecopure did not disclose all information relating to all its affiliates in a timely manner, which according to Commerce was October 16, 2024. Ecopure filed its initial affiliation questionnaire response on October 15, 2024. The record confirms that Ecopure provided Commerce with information needed to determine whether all of its affiliates were crossed owned in its January 3, 2025, supplemental questionnaire response. Commerce did not issue its Preliminary Results until June 18, 2025, five and a half months later, and did not publish its Final Results until February 26, 2026, eight and a half months after the Preliminary Results. Thus, Commerce had more than enough time, about fourteen months, to analyze the additional affiliates disclosed by Ecopure on January 3, 2025. Accordingly, because in this case concerns for accuracy and fairness outweigh those for finality and agency burden, Commerce's reliance on late filing as the basis for its total AFA decision is not supported by substantial evidence and is contrary to law.

**3. Whether Commerce's Decision That Ecopure's Submissions Were Unreliable Was Supported By Substantial Evidence**

Commerce relied on total AFA based on its belief that Ecopure's affiliation responses were "constantly shifting" and, therefore, not "reliable or usable." This conclusion is not supported by substantial evidence. In its initial October 15, 2024, affiliation response, Ecopure

correctly identified the three cross-owned companies for which it would be filing a complete CVD response. In addition, Ecopure identified other companies in which these cross-owned companies had an ownership interest. In its January 3, 2025, supplemental response, Ecopure advised Commerce of two corrections to its initial affiliation response. First, Ecopure inadvertently failed to report related party transactions with one of its affiliates. This inadvertent error, which Ecopure corrected when it realized its mistake, does not constitute reason to conclude that Ecopure's response was unreliable and had no impact on Commerce's subsidy analysis/calculation.

Second, Ecopure's initial affiliation October 15, 2024, response only included affiliates in which Ecopure had an ownership interest. While Ecopure did not formally report other affiliated companies in its October 15, 2024 response, their names and relationship with Ecopure were reported in an audited financial statement submitted to Commerce on November 22, 2024, and none of these companies were cross-owned affiliates within the meaning of 19 C.F.R. 351.525(b)(6)(vii). Thus, Ecopure clearly did not intend to hide the existence of these affiliates from Commerce. This mistake also does not constitute sufficient evidence to conclude that Ecopure's affiliation response was unreliable.

Finally, Commerce concluded that there was "a strong indication" that an Ecopure affiliate was "involved in the production and/or export of subject merchandise" because the company produces merchandise that is classified in an HTS subheading listed in the CVD Order as an HTS subheading in which subject merchandise is classified. IDM at 20. This conclusion is facially absurd; the fact that two products are classified in the same HTS subheading (which in this case is a residual basket subheading in which multiple miscellaneous products are classified) does not constitute evidence that a company producing product A is involved in the production

of product B. Moreover, there exists substantial record evidence that the merchandise in issue is not subject merchandise.

**4. Whether 19 U.S.C. § 1677m(d), Which Prohibits Commerce From Relying On Total AFA Without Providing Ecopure With The Opportunity To Cure The Deficiencies Upon Which Commerce Relied, Applies To This Case**

Prior to applying facts available, Commerce must "promptly inform the person submitting the response of the nature of the deficiency and shall, to the extent practicable, provide that person with an opportunity to remedy or explain the deficiency." 19 U.S.C. § 1677m(d). In this case, Commerce accepted Ecopure's January 3, 2025, supplemental response, and did not notify Ecopure that the response was deficient or provide Ecopure with "an opportunity to remedy or explain the deficiency." Indeed, Defendant-Intervenor Organic Soybean Processors of America ("Petitioner") asked Commerce to ask Ecopure additional questions regarding its affiliates. Commerce's failure to provide Ecopure an opportunity to correct its error, leading to a 75.48% subsidy rate, renders its reliance on AFA contrary to law.

**5. Whether Ecopure's Errors Were Sufficiently Egregious To Allow Commerce To Rely on the Extraordinary Remedy Of Total AFA**

The law is clear. Reliance on total AFA is not appropriate when Commerce's AFA decision is speculative in light of the record, which demonstrated that most of the proffered price information was reliable. While application of AFA does not require evidence of bad faith on the part of a respondent, it does require that Commerce consider the reasons why a respondent failed to act to the best of its ability. Commerce needs to be especially careful that it has not abused its discretion when its decision will result in rejection of all data submitted.

The record in this case does not support Commerce's reliance on total AFA. Ecopure answered every questionnaire on time, submitted more than 300 exhibits, and certified their accuracy. That certain evidence may appear inconsistent does not mean that there is any

evidence missing from the record. Commerce is required to resolve inconsistencies in the record, by asking additional questions. In this case, Commerce had more than enough time to resolve inconsistencies. Its failure to do so precludes Commerce from relying on total AFA.

Moreover, Commerce did not identify any affiliate not previously disclosed by Ecopure as being cross-owned; rather, Commerce merely reasoned that it was "unable to confirm" this point. But Commerce never asked for confirmation. Nor did Commerce find that any of the subsidy information Ecopure reported was unreliable or unusable. Ecopure responded to all Commerce questionnaires in a timely manner, submitting voluminous documentation in support of its position. Ecopure has certified as to the accuracy of its responses and Commerce has not questioned the integrity of any of the data provided, with the sole, inexplicable exception of rejecting all data submitted merely because Ecopure did not report all affiliates in its initial October 15, 2024, affiliation questionnaire response.

**6. Whether Commerce Departed From Its Established Practice And Without Adequate Explanation Treated Ecopure Differently From Other Respondents in other Cases, and Tejawat in this Case**

Respondents in CVD cases routinely make mistakes in reporting all affiliates in their initial affiliation responses. Respondents then often report additional affiliates in subsequent responses and Commerce routinely accepts these responses. In this case, on January 23, 2025, Commerce asked the second mandatory respondent, Tejawat, to provide additional information regarding changes in Tejawat's initial affiliation response. Thus, the manner in which Commerce treated Ecopure in this case constitutes a departure from longstanding Commerce precedent and from the manner in which it treated Tejawat. Accordingly, Commerce's decision is contrary to law.

### C. Reasons for Contesting the Determination

Ecopure's reasons for contesting the Final Results are set out below.

## STANDARD OF REVIEW

This Court must hold unlawful any aspect of Commerce's final determination that is "unsupported by substantial evidence on the record, or otherwise not in accordance with law." 19 U.S.C. § 1516a(b)(1)(B)(i). Substantial evidence is "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *See Consol. Edison Co. v. NLRB*, 305 U.S. 197, 217 (1938); *Matsushita Elec. Indus. Co. v. United States*, 750 F.2d 927, 933 (Fed. Cir. 1984). Substantial evidence requires more than mere assertion of "evidence which in and of itself justified {the determination}, without taking into account contradictory evidence or evidence from which conflicting inferences could be drawn." *See Gerald Metals, Inc. v. United States*, 132 F.3d 716, 720 (Fed. Cir. 1997) (quotation omitted). For decisions to be supported by substantial evidence, "Commerce may not base that determination 'on the basis of mere conjecture or supposition.'" *See Yangzhou Bestpak Gifts & Crafts Co. v. United States*, 716 F.3d 1370, 1378 (Fed. Cir. 2013) (quoting § 1677(7)(F)(ii)). Commerce, as any agency, must "cogently explain why it has exercised its discretion in a given manner." *See Motor Vehicle Mfgrs. Ass'n v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 48 (1983).

To be "in accordance with law," Commerce must comply with the applicable statutory requirements when issuing a determination. *See Loper Bright Enters. v. Raimondo*, 144 S. Ct. 2244, 2261 (2024). Following *Loper Bright Enterprises v. Raimondo*, courts no longer apply *Chevron* deference to agency decisions; instead, courts exercise independent judgment in determining the meaning of statutes administered by agencies, though they may still give weight

to agency interpretations as persuasive authority. *See id.*

"Despite Commerce's statutory discretion, . . . if Commerce has a routine practice for addressing like situations, it must either apply that practice or provide a reasonable explanation as to why it departs therefrom." *See Save Domestic Oil, Inc. v. United States*, 357 F.3d 1278, 1283-84 (Fed. Cir. 2004). "When an agency changes its practice, it is obligated to provide an adequate explanation for the change." *See SKF USA, Inc. v. United States*, 630 F.3d 1365, 1373 (Fed. Cir. 2011). "An agency action is arbitrary when the agency offer{s} insufficient reasons for treating similar situations differently." *See SKF USA, Inc. v. United States*, 263 F.3d 1369, 1382 (Fed. Cir. 2001) (quotation omitted). "If the Department provides 'no reasonable explanation' for changing a practice that it has 'consistently followed,' such a change is an unacceptable agency practice." *See WelCom Prods., Inc. v. United States,* 865 F. Supp. 2d 1340, 1344 (CIT 2012).

## STATEMENT OF FACTS

On July 5, 2024, Commerce initiated AR2 of the CVD order on organic soybean from India. *See Initiation of Antidumping and Countervailing Duty Administrative Reviews*, 89 Fed. Reg. 55,567, 55,575 (July 5, 2024) (**PR 184**). On September 30, 2024, Commerce selected Ecopure and Bergwerff Organic India Pvt. Ltd. as mandatory respondents. *See* Dep't of Com. Respondent Selection Memorandum (Sep. 30, 2024) (**CR 130**) (**PR 165**). This was the first time that Ecopure had been individually reviewed by Commerce. On October 3, 2024, Petitioner withdrew its request for all respondents; however, the review for Ecopure continued because Ecopure had requested its own review. Petitioner Withdrawal of Review Request (Oct. 3, 2024) (**PR 166**); Ecopure Request for Administrative Review (May 30, 2024) (**PR 189**).

On October 2, 2024, Commerce issued its questionnaire to the Government of India, with instructions to forward the questionnaire to the mandatory respondents. Dep't of Com.

Countervailing Duty Questionnaire (Oct. 2, 2024) (**PR 167-68**) ("Initial Questionnaire"). Section III of Commerce's Initial Questionnaire to the Government of India requested identification of affiliated companies ("Affiliation Questionnaire") within fourteen days of the date of the questionnaire. *Id.* On October 9, 2024, Commerce selected Tejawat as a replacement mandatory respondent. Dep't. of Com. Selection of Replacement Respondent (Oct. 9, 2024) (**PR 161**).

On October 11, 2024, Commerce advised Ecopure that it "must provide a complete response for a cross-owned company that is a holding or a parent company of Ecopure," and "must report all affiliated companies and provide requested information about the affiliated companies." Dep't of Com. *Ex Parte* Memorandum at 1 (Oct. 11, 2024) (**PR 159**). On October 15, 2024, Ecopure, without requesting an extension, responded to Commerce's Affiliation Questionnaire by advising Commerce that it would be submitting a complete response for three companies: (1) Ecopure; (2) LT Foods Limited ("LTFL"); and (3) and Nature Bio Foods Limited ("NBFL"). *See* Ecopure Section III Affiliation Questionnaire Response (Oct. 15, 2024) (**CR 127**) (**PR 157**) ("Ecopure III Affiliation QR"). Ecopure also submitted information regarding [ ] companies in which these three companies had an ownership interest, specifying among other information, the nature of the relationship, percentage holding of equity shares by the affiliate, whether the company was involved in subject merchandise, corporate activities, whether the company was a supplier of raw materials for subject merchandise, and whether there were common board members. *Id.*

On October 23, 2024, Commerce requested additional information from Ecopure relating to its October 15, 2024, response. Dep't of Com. Affiliation Supplemental Questionnaire to Ecopure (Oct. 23, 2024) (**CR 126**) (**PR 153**). Ecopure responded on November 3, 2024. Ecopure Affiliation Supplemental Questionnaire Response (Nov. 3, 2024) (**CR 123**) (**PR 158**) ("Ecopure

Affiliation SQR").[1]

On November 22, 2024, Ecopure submitted its response to Commerce's CVD questionnaire, providing full subsidy responses for Ecopure, LTFL and NBFL. Ecopure Section III Initial Questionnaire Response (Nov. 22, 2024) (**CR 75-100**) (**PR 118-26**) ("Ecopure III IQR"). This response consisted of 85 pages of text and 127 exhibits (numbered 1 to 71, with certain exhibits having multiple parts). *Id.* Many of these exhibits consisted of business documents; others were excel spreadsheets prepared in response to Commerce's questions. *Id.* The response contained 2,905 pages of documents and data. *Id.* The response was timely filed and complete. *Id.* Ecopure and its counsel certified that the response was accurate. *Id.* at 7.

LTFL's audited financial statement for 2023-24 ("LTFL's financial statement") was attached as Exhibit 11 of this response. *Id*. Exhibit 11. It includes a list of LTFL's related companies, specifying the nature of the relationship (e.g., subsidiary) and the nature of its contacts with LTFL. *Id*. Exhibit 11 at 133-36, 384-85 (providing a list of subsidiaries). The names of companies in which LTFL held an ownership interest already had been included in Ecopure's October 15, 2024, submission. Ecopure III Affiliation QR Exhibit 2 (**CR 127**). Further, LTFL's financial statement contained a list of "{e}nterprise{s} having significant influence" and "{e}ntities in which {k}ey {m}anagement {p}ersonnel and their relatives have significant influence and with whom transactions have taken place during the year or previous year." Ecopure III IQR Exhibit 11 at 380 (**CR 75-100**). LTFL did not have an ownership interest in these companies. Ecopure III Affiliation QR Exhibit 2 (**CR 127**). Ecopure had not reported the names of these companies in its October 15, 2024, submission. *Id.*

[1] On November 3, 2024 Ecopure Affiliation SQR, Ecopure reported [ ] additional affiliate companies and [ ] individual promoters, resulting in a total of [ ] affiliates. Dep't of Com. Ecopure AFA Memorandum at 2 (Feb. 23, 2026) (**CR 3**) ("Final AFA Memo") at 2.

In response to General Question 8, Ecopure advised that it exported subject merchandise in HTS code 2304.00.10. Ecopure III IQR at 10-11 (**CR 75-100**). Exhibit 22 included a copy of India HTS Code 2304.00.10. *Id.* Exhibit 22. This code covers "oil-cake and oil-cake meal of soyabean, expeller variety." *Id.* This Exhibit also included the tariff descriptions of HTS 2301-2309, and Chapter 23, Note 1, that provides, in pertinent part, that "Heading 2309 includes products of a kind used in animal feeding, not elsewhere specified or included." *Id.* The specific language of Heading 2309 covers "preparations of a kind used in animal feeding." Heading 2309, HTS. *Id.* In other words, soybean meal subject to this investigation is expressly included in Heading 2304; that being the case, soybean meal is not classified in the residual basket Heading 2309. *See id.*

On December 13, 2024, Petitioner submitted comprehensive comments to Ecopure's questionnaire responses. Petitioner's Comments on Ecopure's Responses (Dec. 13, 2024) (**CR 59**) (**PR 86**). On the same date, Commerce issued a supplemental questionnaire. Dep't of Com. Section III Supplemental Questionnaire to Ecopure (Dec. 13, 2024) (**CR 57**) (**PR 84**) ("III Supplemental Questionnaire"). Question 4 of the supplemental questionnaire provides:

> In Exhibits 6 and 7 of your IQR, you provided Ecopure's audited financial statements. These exhibits show [
> ]. Ecopure failed to report this company and disclose its affiliation in the affiliation questionnaire responses. Please explain why you failed to disclose Ecopure's affiliation with this company, and provide respond to the affiliation questions in the initial questionnaire with respect to this company.

*Id.*

Ecopure responded to Commerce's supplemental questionnaire on January 3, 2025. Ecopure Section III First Supplemental Response (Jan. 3, 2025) (**CR 41-55**) **(PR 73-78**) ("Ecopure III SQR"). Ecopure's III SQR contained 87 pages of text and 168 exhibits, including PDF documents and excel worksheets. *Id.* Exhibits were numbered SS1-SS54, since many

exhibits contained multiple parts. *Id.* at 85-87. The submission contained 2784 pages. *Id.* The response was timely filed and complete. *Id.* Ecopure and its counsel certified as to its accuracy. *Id.* at 9.

In response to Question 4, Ecopure expressed "regrets for unintended and inadvertent error" and updated its affiliation charts with information regarding [ ]. *Id.* at 13-14. Ecopure also advised Commerce that "on re-visiting" the annual reports of Ecopure, LTFL and NBFL, "it realized a few entities are in the list of annual report but inadvertently missed in Affiliates exhibits submitted previously." *Id.* at 14. Thus, Ecopure provided a "revised list containing all the requisite information," in exhibits to Ecopure III SQR. *Id*. Exhibits SS-11, SS-12, SS-13.[2]

SQR Exhibits SS-11, SS-12, and SS-13 contain information establishing that none of the [ ] companies added to the initial list of affiliates were cross-owned within the meaning of 19 C.F.R. 351.525 and would be required to provide a questionnaire response. *Id.* The exhibit showed that none of these companies: (1) were cross-owned with Ecopure/ LTFL/ NBFL; (2) had a shareholder relationship with Ecopure/ LTFL/ NBFL (which was the case with previously reported affiliates); (3) supplied raw materials for subject merchandise to Ecopure/ LTFL/ NBFL; (4) produced subject merchandise; and (5) engaged in any activities relating to the production or sale of subject merchandise. *Id.* The spreadsheets submitted by Ecopure show that these companies were engaged in multiple activities unrelated to subject merchandise, such as [ ]. *Id.* Also, the vast majority of these companies are located outside of India. *Id.* In

[2] The revised list of affiliates reported in the January 3, 2025 Ecopure Section III First Supplemental Response included the [ ] additional affiliates and [ ] individual promoters, previously disclosed in the November 3, 2024 Ecopure Affiliation SQR.

short, based on the facts reported to Commerce, these companies do not fall within the definition of cross-owned entities under 19 C.F.R. 351.525 whose business activities are subject to Commerce's analysis. *Id.*

Thus, as of January 3, 2025, the record contained information regarding Ecopure's [ ] affiliated companies. These companies fall into the following groups.

1. Cross-owned companies (**2**) reported as such on October 15, 2024, for which Ecopure submitted full questionnaire responses on November 22, 2024: LTFL (ultimate holding company) and NBFL (holding company) submitted their full questionnaire responses.

2. Companies which are not cross-owned ([ ]) for which full reporting is not required:

   a. Producer of non-subject merchandise [ ] - [ ] disclosed October 15, 2024;

   b. Companies in which Ecopure/LTFL/NBFL had an ownership interest, but were not crossed-owned and also did not possess any other qualifying attribution relationship necessary for full reporting - [ ] - disclosed October 15, 2024 (including [ ] companies not based in India);

   c. Companies in which Ecopure/LTFL/NBFL did not have an ownership interest or any other qualifying attribution relationship necessary for full reporting - [ ] - disclosed January 3, 2025 (including [ ] companies not based in India).

Ecopure III SQR Exhibits SS-11, SS-12, SS-13.

Two weeks later, on January 16, 2025, Petitioner commented on Ecopure's January 3, 2025, supplemental response. *See* Petitioner, Comments Concerning Ecopure's Section III First Supplemental Response at 5-6 (Jan. 16, 2025) (**CR 39**) (**PR 65**) ("Petitioner's Comments on Ecopure III SQR"). Petitioner's response totaled forty-four pages and focused on Ecopure's detailed responses to the Commerce's questions regarding subsidiaries. *Id.* at 1. Two of Petitioner's comments are relevant to this litigation. **First**, Petitioner noted that one of the affiliates which Ecopure originally reported, [ ], was involved in the [ ], which

according to Petitioner "may incorporate subject merchandise" because [ ] advised that [ ] was classified in HTS [ ]. *Id.* at 5. According to Petitioner, [ ] could be classified in HTS [ ], because that HTS code is listed in the Petition. *See id.* at 6-8. Thus, Petitioner requested that Commerce ask Ecopure to "explain whether this product incorporates subject merchandise." *Id.* at 6. **Second**, Petitioner noted that Ecopure had identified additional respondents in its January 3, 2025, supplemental response. *Id.* at 6-7. Petitioner requested that Commerce ask Ecopure to "explain why you chose not to disclose these affiliates earlier." *See id.* at 8. Nowhere in its submission did Petitioner suggest, either expressly or implicitly, that Commerce should reject Ecopure's submissions, in whole or in part. *See id.* at 6-8.

Commerce did not follow Petitioner's advice and did not request any additional information from Ecopure prior to issuing its Preliminary Results. In contrast, on January 23, 2025, Commerce asked the second mandatory respondent, Tejawat, to provide additional information regarding changes in Tejawat's initial affiliation response. Dep't of Com. Section III Supplemental Questionnaire to Tejawat at 1 (Jan. 23, 2025) (**CR 29**) (**PR 61**).

> In your supplemental affiliation questionnaire response of November 5, 2024, at Exhibit FS-3 Tejawat reported that it purchases soybeans only from unaffiliated suppliers. In Tejawat's IQR Tejawat revised its answer and exhibit, submitting Exhibit 1A Part 1.
> a. Under column [ ], please explain whether these eight entities are individuals or companies that supplied raw materials to produce subject merchandise. Please list whether these parties are unaffiliated or affiliated with Tejawat.

*Id.* at 4 (footnote omitted).

Tejawat responded to Commerce's questions on February 10, 2025, as follows:

> Tejawat sincerely regrets for such an inadvertent and unintended error at page 4 of IQR wherein Tejawat mentioned: OMSHREE AGRO TECH PVT.LTD. is an [ ], while OMSHREE AGRO TECH PVT.LTD is an [ ]

> party
>
> Tejawat clarifies that OMSHREE AGRO TECH PVT.LTD. is an [ ].
>
> Further Tejawat rechecked the Exhibit 1A-Part-1: LIST OF NAMES OF THE SUPPLIER
> And
> Exhibit 1A-Part-2: List of Affiliated / Group Companies of Tejawat Organic Foods as on December 31, 2023 submitted in IQR and in the both Exhibits Tejawat mentioned OMSHREE AGRO TECH PVT.LTD as [ ]. Tejawat regrets for confusion if any.

Tejawat Section III Supplemental Questionnaire Response at 2 (Feb. 10, 2025) (**CR 23-26**) (**PR 52**) ("Tejawat III SQR").

On April 8, 2025, Petitioner filed comments in advance of the Preliminary Results. Petitioner Pre-Prelim Comments (Apr. 8, 2025) (**CR 21**) (**PR 50**). These comments focused on substantive issues unrelated to affiliations and did not discuss [ ] production of [ ] or the additional affiliates reported by Ecopure on January 3, 2025. *Id.*

On May 15, 2025, Commerce issued a second supplemental questionnaire to Tejawat, to which the company replied on May 20, 2025. Dep't of Com. Section III Second Supplemental Questionnaire to Tejawat (May 15, 2025) (**CR 20**) (**PR 47**); Tejawat Section III Second Supplemental Response (May 20, 2025) (**CR 16-18**) (**PR 45**) ("Tejawat III 2SQR").

On June 18, 2025, Commerce published its Preliminary Results of AR2. *Organic Soybean Meal From India: Preliminary Results and Partial Rescission of Countervailing Duty Administrative Review; 2023*, 90 Fed. Reg. 25,994, 25,995 (June 18, 2025) (**PR 36**) ("Preliminary Results"), and accompanying Preliminary Decision Memorandum (**PR 37**) ("PDM"). Commerce preliminarily rejected all of Ecopure's submissions and applied a 340.27% total AFA rate to Ecopure. Dep't of Com. Ecopure AFA Memorandum at 2 (June 13, 2025) (**CR**

**13**) (**PR 35**) ("Prelim AFA Memo"). This decision was based on two subsidiary findings. *Id.* First, Commerce reasoned that Ecopure's affiliation response was unreliable:

> Ecopure reported [ ] as an affiliate, and, without solicitation, reported [ ] new previously undisclosed affiliates . . . . This change in reporting . . . occurred long after the initial affiliation information was due, increased the total number of affiliates reported by Ecopure from [ ] to [ ] and calls into question the reliability of Ecopure's affiliation reporting.

*Id.* at 2.

Second, Commerce's Prelim AFA Memo noted that the "list of products sold and produced by [ ] during the POR . . . had a line item for [ ] which is an HTS code listed in our scope," and then alleged that these facts are "a strong indication that this cross-owned company is indeed involved in the production and/or export of subject merchandise." *Id.* Accordingly, Commerce decided that Ecopure should be subject to total AFA:

> As of January 3, 2025, Ecopure's latest supplemental questionnaire response, questions remain regarding its complete affiliation and ownership structure, because it reported additional affiliated companies without solicitation . . . . Without confidence in Ecopure's affiliation reporting, Commerce is unable to accurately capture all subsidies received by Ecopure and its cross-owned affiliates.

PDM at 8. (**PR 37**).

Commerce calculated a 3.66% rate for Tejawat, which it also applied to the non-selected respondents. Preliminary Results, 90 Fed. Reg. at 25,995 (**PR 36**).

On June 30, 2025, Ecopure requested that Commerce issue a supplemental post-preliminary questionnaire to Ecopure, and upon receipt of a response, issue a post-preliminary decision. *See* Ecopure Request For Post-Preliminary Supplemental Questionnaire (June 30, 2025) (**CR 10**) (**PR 27**). Commerce never replied to this request.

On July 16, 2025, Ecopure timely filed its administrative case brief challenging

Commerce's preliminary application of total AFA and the 340.27% CVD rate. Ecopure Case Brief (July 16, 2025) (**CR 7**) (**PR 23**). Ecopure argued that its failure to report all affiliates in its initial submission did not warrant application of total AFA, and that it had properly reported information relating to all affiliates in its III SQR on January 3, 2025—nearly six months prior to the Preliminary Results. *Id.* at 16-23.

On July 24, 2025, Ecopure timely filed its administrative rebuttal brief responding to the case brief filed by Petitioner. Ecopure Rebuttal Case Brief (July 24, 2025) (**CR 4**) (**PR 17**). On September 16, 2025, Commerce conducted a public hearing in which Ecopure participated. *See* Hearing Transcript (Sep. 9, 2025) (**PR 12**).

On February 26, 2026, Commerce published its Final Results assigning Ecopure a CVD rate of 75.48% based on total AFA. 91 Fed. Reg. at 9552 (**PR 4**). Commerce rejected Ecopure's arguments and continued to calculate Ecopure's CVD rate based on total AFA, while reducing that rate to 75.48%. IDM Comment 1. Final AFA Memo at 7. Commerce assigned Tejawat an AR2 CVD rate of 3.66%, based primarily on data submitted by Tejawat. Final Results, 91 Fed. Reg. at 9552 (**PR 4**); IDM Comment 2.

## ARGUMENT

Commerce's decision to reject all of Ecopure's data, and instead to rely on a 75.48% total AFA subsidy rate is unsupported by substantial evidence and is contrary to law. As discussed below, this is because: (1) There is no gap in the record; (2) Ecopure cannot be penalized for failing to disclose all affiliates in its initial submission; (3) Ecopure's submissions were reliable; (4) Commerce was required to allow Ecopure to cure the deficiencies upon which Commerce relied; (5) relying on total AFA is an extraordinary remedy, which is not permitted in light of the facts in this case; and (6) Commerce departed from its established practice and also treated

Ecopure differently from the second mandatory respondent, Tejawat, without adequate explanation.

## I. THERE IS NO GAP IN THE RECORD; THUS, RELYING ON AFA WAS CONTRARY TO LAW

Pursuant to 19 U.S.C. § 1677e(a)(1), Commerce cannot apply AFA unless it initially determines that necessary information is missing from the record that must be filled by the use of facts otherwise available. In other words, "Commerce first must determine that it is proper to use facts otherwise available before it may apply an adverse inference." *See Zhejiang DunAn Hetian Metal Co. v. United States*, 652 F.3d 1333, 1346 (Fed. Cir. 2011). "It is clear that Commerce can only use facts otherwise available to fill a gap in the record." *Id.* at 1348.; *see also Hyundai Elec. & Energy Sys. v. United States*, No. 2021-2312, 2022 WL 3273811, at *4 (Fed. Cir. Aug. 11, 2022) ("The Court of International Trade applied the rule that 'Commerce can only use facts otherwise available to fill a gap in the record.'").[3]

[3] The proposition that Commerce can only use facts otherwise available to fill a gap in the record is well-established. *See Dalian Meisen Woodworking Co. v. United States,* 788 F. Supp. 3d 1354, 1379 (CIT 2025) ("not only was the use of {AFA} not supported, but even the use of neutral facts available was not supported by substantial evidence because non-use was actually demonstrated by the evidence on the record. For those of Ancientree's customers where that was done, there were no gaps in the record."); *Dillinger France S.A. v. United States*, 350 F. Supp. 3d 1349, 1364 (CIT 2018) ("the reliability of the reported sales prices has not been called into question and there is no informational gap in the sale prices for Commerce to fill. Therefore, Commerce's decision to apply partial AFA to replace information in the record was not supported by substantial evidence and was contrary to law . . . ."); *Ceramic Tile from India: Final Affirmative Countervailing Duty Determination and Final Affirmative Critical Circumstances Determination, in Part*, 90 Fed. Reg. 17,036 (Apr. 23, 2025) ("*Ceramic Tile from India CVD Final*"), IDM Comment 1 ("Antiqa and Win-Tel provided sufficient evidence on the record for Commerce to determine whether each confirmed affiliate and alleged affiliate was cross-owned with the Antiqa or Win-Tel, and whether the affiliate was required to submit a complete questionnaire response. As such, there is no missing information or gap in the record that would result in Commerce applying facts available to either Antiqa or Win-Tel.").

Moreover, Commerce's regulations expressly provide that there is a very limited number of a respondent's affiliates whose subsidies can be attributable to the respondent. 19 C.F.R. § 351.525(b)(6)(ii-vii). To that end, Commerce follows a 3-part sequential analysis, requiring the respondent to:

(1) report a list of all of its affiliates pursuant to 19 U.S.C. § 1677(33), thereby identifying the broadest group of corporations whose subsidies can be attributable to the respondent[4]

(2) identify from the complete list of affiliates, all cross-owned corporations as defined in 19 C.F.R. 351.525(b)(6)(vii).

> Cross-ownership exists between two or more corporations when one corporation can use or direct the individual assets of the other corporation(s) in essentially the same ways it can use its own assets. Normally, this standard will be met when there is a majority voting ownership interest between two corporations or through common ownership of two (or more) corporations.[5]

(3) identify from list (2), such cross-owned corporations that are producers of identical product, or are holding or parent companies, or producer-suppliers of input primarily dedicated to the production of a downstream product including subject merchandise,

---

4 *See, e.g., Ceramic Tile from India Final*, 90 Fed. Reg. 17,036, IDM Comment 1 ("Antiqa and Win-Tel provided sufficient evidence on the record for Commerce to determine whether each confirmed affiliate and alleged affiliate was cross-owned with the Antiqa or Win-Tel, and whether the affiliate was required to submit a complete questionnaire response. As such, there is no missing information or gap in the record that would result in Commerce applying facts available to either Antiqa or Win-Tel.").

5 The Preamble to the Regulations clarifies that "a large minority voting interest (for example, 40 percent) or a 'golden share' may also result in cross-ownership." *Countervailing Duties*, 63 Fed. Reg. 65,348, 65,401 (Nov. 25, 1998).

or providers of utility products, or transferred subsidy to the respondent. 19 C.F.R. 351.525(b)(6)(ii-vi).

Ultimately, full responses to the Section III questionnaire are required for only the narrowest subset of list (3) cross-owned companies (above) satisfying the particular qualifying attribution relationship, i.e. companies whose subsidies are attributable to the respondent. As the Preamble guides: "Nowhere in the statute or the SAA is there any indication that the affiliated party definition was intended to be used for subsidy attribution purposes. Rather, it identifies the broadest category of relationships which might be relevant to ... a countervailing duty analysis." *Countervailing Duties*, 63 Fed. Reg. 65,348, 65,401 (Nov. 25, 1998).

The Preamble, while rejecting affiliation as the governing attribution standard, cautions that doing so "would result in the Department expending unnecessary resources collecting information from corporations about subsidies which are not benefitting the production of the subject merchandise, or diluting subsidies more properly attributed to input producers by allocating such subsidies over the production of remotely related and affected downstream producers." *Countervailing Duties*, 63 Fed. Reg. 65,348, 65,401 (Nov. 25, 1998). These caveats are relevant here.

As discussed above, on October 15, 2024, Ecopure reported all companies with which Ecopure/LTFL/NBFL had an ownership interest, including the three companies for which it was ultimately required to submit a full questionnaire response, i.e. Ecopure, LTFL and NBFL. Then, in its initial November 22, 2024, questionnaire response, Ecopure submitted complete responses for these three companies. In that response, Ecopure also submitted LTFL's financial statement containing the names of all affiliated companies, including those in which it held an ownership interest (reported in the October 15, 2024, initial affiliation response) and those in which it did

not (not reported in the October 15, 2024, submission). Ecopure III IQR Exhibit 11 at 380 (**CR 75-100**). In its January 3, 2025, supplemental response, Ecopure provided Commerce with a corrected, complete list of affiliates, and expressly advised Commerce as to the nature of the relationship and whether these companies were cross-owned and/or were involved in the production and sale of subject merchandise. *See* Ecopure III SQR Exhibits SS-11, SS-12, SS-13 (**CR 41-55**).

The information submitted on January 3, 2025, revealed that none of the newly-disclosed affiliated companies were cross-owned and that none of the companies was involved in subject merchandise, or was a supplier of raw material for subject merchandise, or was a holding company. *See id.* Commerce accepted this submission, which was consistent with the information contained in LTFL's financial statement. *See* Ecopure III IQR Exhibit 11 at 380 (**CR 75-100**); Ecopure's January 3, 2025 submission, which is consistent with information in LTFL's financial statement, confirms that that these companies are not cross-owned and do not fall within any of the qualifying attribution categories in 19 C.F.R. § 351.525(b)(6). Ecopure III SQR Exhibits SS-11, SS-12, SS-13 (**CR 41-55**).

As such, for all affiliated companies (including the [ ] companies disclosed on January 3, 2025), necessary information regarding their cross-ownership and particular attribution relationship with Ecopure is available on the record. Significantly, Commerce has not challenged the veracity or completeness of any timely filed Questionnaire responses submitted by Ecopure on November 22, 2024 for its three cross-owned companies. And confirmation that full responses were not required for the other Ecopure affiliates is found in the financial statements submitted November 22, m2024.

Consequently, for all [ ] affiliates, the record contains all necessary information

Commerce needed to determine whether any additional affiliate satisfied all prongs of the 3-part attribution analysis, a threshold consideration for triggering their reporting to Section III questionnaire.

In sum, there is no gap in the record regarding the names, ownership, and business dealings of all of Ecopure's affiliates and no gap in the record as to whether Ecopure is required to submit complete questionnaire responses for these affiliates. *See id.* This being the case, Commerce's decision to rely on facts available is contrary to law, which means that its decision to rely on total AFA also is contrary to law.

## II. COMMERCE CANNOT RELY ON TOTAL AFA MERELY BECAUSE ECOPURE FAILED TO DISCLOSE ALL AFFILIATES IN ITS INITIAL OCTOBER 15, 2024, SUBMISSION

Commerce's decision to rely on total AFA, in large part, was based on its subsidiary conclusion that Ecopure did not disclose all information relating to all of its affiliates in a timely manner. IDM at 16, 19-20. Commerce states that "Ecopure had this information {regarding all of its affiliates} but failed to disclose it to Commerce until after the applicable deadline, warranting the application of adverse inferences for Ecopure." *See id.* ("Ecopure significantly impeded this proceeding by failing to adequately respond to the affiliated companies portion of section III of the Initial Questionnaire by the established deadline of October 16, 2024.").

As discussed above, Ecopure provided Commerce with all information needed to determine whether its affiliates were cross owned in its January 3, 2025, SQR. *See* Ecopure III SQR Exhibits SS-11, SS-12, SS-13 (**CR 41-55**). Commerce did not issue its Preliminary Results until June 18, 2025, five and a half months later, and did not publish its Final Results until February 26, 2026, eight and a half months after the Preliminary Results. Preliminary Results, 90 Fed. Reg. at 25,995 (**PR 36**); Final Results, 91 Fed. Reg. at 9552 (**PR 4**). Thus, Commerce had

more than enough time, about fourteen months, to analyze the additional affiliates disclosed by Ecopure. *See* Final Results, 91 Fed. Reg. at 9552 (**PR 4**). In fact, Commerce issued supplemental questionnaires to the second mandatory respondent Tejawat, on January 23, 2025, and May 15, 2025, after receipt of Ecopure's January 3, 2025, corrected affiliation submission. *See* Section III Supplemental Questionnaire to Tejawat (**CR 29**); Section III Second Supplemental Questionnaire to Tejawat (**CR 20**).

In light of these facts, Commerce committed reversible legal error by basing its total AFA decision on Ecopure's failing to submit certain information by the established deadline for its initial affiliation response. IDM at 16, 19-20. In *Pro-Team Coil Nail Enterprise, Inc. v. United States*, this Court discussed the timeliness issue as follows.

> Regarding the issue of untimeliness, it is well-settled that a deadline-setting regulation that "is not required by statute may, in appropriate circumstances, be waived and must be waived where failure to do so would amount to an abuse of discretion." *NTN Bearing*, 74 F.3d at 1207 . . . . "Commerce is free to correct *any* type of {respondent} error—clerical, methodology, substantive, or one in judgment—in the context of making an antidumping duty determination, provided that the {respondent} seeks correction before Commerce issues its final results and adequately proves the need for the requested corrections." *Timken*, 434 F.3d at 1353 (emphasis added); *see also Fischer S.A. Comercio, Industria and Agricultura v. United States*, 34 C.I.T. 334, 346, 700 F. Supp. 2d 1364, 1375 (2010) ("*Timken* and *NTN Bearing* both stress that, at the preliminary results stage, Commerce abuses its discretion where it refuses to let a respondent establish an accurate dumping margin by correcting mistakes in its response.")
> When "reviewing Commerce's decision to reject corrective information" the court may consider "Commerce's interest in ensuring finality, the burden of incorporating the information, and consideration of whether the information will increase the accuracy of the calculated dumping margins." ... An evaluation of these factors has led the court to remand Commerce's refusal to consider corrective information (including information to correct an omission) submitted early in the proceeding.

419 F. Supp. 3d 1319, 1330-34 (CIT 2019).

This proposition concerning the timeliness of submissions has been repeatedly affirmed by this Court. *See Grobest & I-Mei Indus. (Vietnam) Co. v. United States*, 815 F. Supp. 2d 1342,

1367 (CIT 2012) ("though the submission was ninety-five days late, it arrived early in the review process: more than seven months before Commerce released the preliminary results and one year before Commerce released the Final Results. Thus, there is no concern with finality in this case . . . . Amanda Foods was diligent in seeking to correct the omission of its SRC, promptly filing its late submission as soon as it discovered the omission."); *Fine Furniture (Shanghai) Ltd. v. United States*, 865 F. Supp. 2d 1254, 1269 (CIT 2012) ("Eswell Enterprises's failure to respond to the Q & V Questionnaire is not dispositive once a correction is requested and new evidence is placed on the record. Under these circumstances, Commerce must consider the evidence so long as the concerns for accuracy and fairness outweigh those for finality and agency burden—which they do here—and failure to consider the evidence renders a determination unsupported by substantial evidence.").

Moreover, Commerce often has rejected Petitioners' arguments that total AFA was the appropriate remedy for late reporting of affiliates, when the affiliates ultimately were reported and Commerce was "able to fully analyze these submissions prior to publication of the *Preliminary Results*." *Multilayered Wood Flooring from the People's Republic of China: Final Results of Antidumping Duty Administrative Review, Final Determination of No Shipments, and Final Successor-in-Interest Determination; 2020-2021*, 88 Fed. Reg. 42,293 (June 30, 2023), ("*MLWF from China*"), IDM Comment 1.[6]

[6] Commerce discussed this issue as follows: "We disagree that Fuerjia failed to provide such information in a timely manner. We received Fuerjia's Second SQR on September 13, 2022, and Fourth SQR on October 21, 2022, and we were able to fully analyze these submissions prior to publication of the *Preliminary Results* on December 28, 2022. We also disagree that Fuerjia significantly impeded the proceeding. In the Second SQR, Fuerjia certified that it was reporting all its affiliates regardless of whether the company produced or sold subject merchandise and regardless of whether it sold any products to the United States." *MLWF from China*, 88 Fed. Reg. 42,293, IDM Comment 1.

Commerce has concluded that a respondent's "initial failure to disclose . . . {an} ownership interest in Company A to be a harmless omission," since that company was "identified . . . as a potential affiliate prior to the preliminary determination." *Xanthan Gum from Austria: Final Determination of Sales at Less Than Fair Value*, 78 Fed. Reg. 33,354 (June 4, 2013), ("*XG from Austria*"), IDM Comment 2. The critical factor in Commerce's "late reporting – AFA" analysis is whether "by not disclosing additional affiliates until verification as a minor correction," the respondent "withheld essential information and precluded Commerce from analyzing whether its affiliates met the criteria for cross-ownership in any capacity." *Id.* Such is not the case here.

In sum, judicial precedent and administrative practice prohibit Commerce from penalizing a respondent who corrects an initial submission in a timely manner. *Grobest, Fine Furniture, MLWF from China, XG from Austria*. Thus, Commerce abused its discretion by relying on total AFA simply because Ecopure did not fully disclose all information regarding certain affiliates in its initial affiliation response. *See id.* Ecopure disclosed the information as soon as it became aware of its error, which was five and a half months prior to Commerce's Preliminary Results and fourteen months prior to the Final Results, thereby alleviating any concerns regarding finality. Preliminary Results, 90 Fed. Reg. at 25,995 (**PR 36**); Final Results, 91 Fed. Reg. at 9552 (**PR 4**). Moreover, since Ecopure did not have any ownership interest in the undisclosed companies, those companies were not cross-owned with Ecopure, and the rationale underlying Commerce's request for this information at the outset of this annual review did not apply. *See* Ecopure III SQR Exhibits SS-11, SS-12, SS-13 (**CR 41-55**). Accordingly, because concerns for accuracy and fairness outweigh those for finality and agency burden, Commerce's

reliance on late filing as the basis for its decision to rely on total AFA is not supported by substantial evidence and is contrary to law.

## III. COMMERCE'S DECISION THAT ECOPURE'S SUBMISSIONS WERE UNRELIABLE WAS NOT SUPPORTED BY SUBSTANTIAL EVIDENCE

Commerce relied on total AFA based on its belief that Ecopure's affiliation responses were "constantly shifting" and, therefore, not "reliable or usable." IDM at 20. Commerce states:

> {G}iven the unsolicited disclosure of over a dozen affiliates in Ecopure's January 3, 2025 supplemental questionnaire response, and the inconsistent affiliation information provided prior to that point, including the description of a cross-owned affiliate changing and thus precluding us from conducting our attribution analysis, questions still remain regarding whether the information submitted as part of Ecopure's January 3, 2025 supplemental questionnaire response is indeed a complete and accurate account of its affiliates.

*Id.* at 22 ("Without confidence in Ecopure's affiliation reporting, due to repeated shifts in affiliates reported, and at least one instance of a changing description for an affiliate, Commerce is unable to confirm whether the provided affiliates meet the criteria for cross-ownership."); *Id.* at 23-24 ("{C}onsidering the unreliability of Ecopure's affiliation reporting, we continue to find that there is a strong indication that the cross-owned company in question is involved in the production of subject merchandise given the lack of definitive proof to the contrary.").

Commerce's claim that Ecopure's affiliation submissions were unreliable is not supported by substantial evidence. *Id.* at 20. In its initial October 15, 2024, affiliation response, Ecopure correctly identified the three cross-owned companies for which it would be filing a complete CVD response and other companies in which these cross-owned companies had an ownership interest. Ecopure III Affiliation QR Exhibits 1-3, at 2-4 (**CR 127**). In its January 3, 2025, supplemental response, Ecopure advised Commerce of two corrections to its initial affiliation response. *See* Ecopure III SQR at 14 (**CR 41-55**). First, Ecopure inadvertently failed to report [ ].

*See id.* Commerce had identified this mistake in its December 13, 2024, questionnaire, III Supplemental Questionnaire (**CR 57**), since the inadvertent error was obvious from reviewing Ecopure's financial statement, which had been submitted to Commerce on November 22, 2024. Ecopure III IQR Exhibits 6-7 (**CR 75-100**). This inadvertent error, which Ecopure corrected when it realized its mistake, upon request of Commerce, does not constitute reason to find Ecopure's response unreliable.

Second, Ecopure's October 15, 2024 affiliation response only included affiliates in which Ecopure, NBFL and LTFL had an ownership interest and did not include companies "in which {k}ey {m}anagement {p}ersonnel and their relatives have significant influence and with whom transactions have taken place during the year or previous year." Ecopure III IQR Exhibit 11 at 380 (**CR 75-100**). While Ecopure did not report these companies in its October 15, 2024, affiliation spreadsheet, their names and relationship with Ecopure were reported in LTFL's financial statement, submitted to Commerce on November 22, 2024. *Id.* Thus, Ecopure clearly did not intend to hide the existence of these affiliates from Commerce; rather, its oversight reflected the fact that these companies: (1) did not have any ownership interest in Ecopure/ LTFL/ NBFL (the three cross-owned companies) or vice-versa; (2) did not supply raw materials for subject merchandise to Ecopure/ LTFL/ NBFL; (3) did not produce subject merchandise; and (4) did not engage in any activities relating to the production or sale of subject merchandise. *See* Ecopure III SQR Exhibits SS-11, SS-12, SS-13 (**CR 41-55**). Moreover, Ecopure's January 3, 2025, submission conformed to the information regarding affiliates in LTFL's financial statement Ecopure submitted on November 22, 2024. *Id.*; Ecopure III IQR Exhibit 11 at 380 (**CR 75-100**). This mistake also does not constitute sufficient evidence to conclude that Ecopure's affiliation response was unreliable.

Finally, Commerce concluded that there was “a strong indication” that [ ], an affiliate which Ecopure originally reported as [ ], actually was “involved in the production and/or export of subject merchandise.” IDM at 23. Commerce’s “strong indication” conclusion is based on the following facts: (1) [ ] produces [ ]; (2) [ ] listed [ ] as being classified in HTS [ ]; (3) HTS [ ] is listed as an HTS subheading in which subject merchandise is classified. *Id.* According to Commerce, these facts constituted a strong indication that “this cross-owned company is indeed involved in the production and/or export of subject merchandise.” IDM at 23.

Commerce’s conclusion is facially absurd. No record evidence shows that [ ] is subject merchandise, and the fact that [ ] may be classified in the residual, alternative HTS subheading for subject merchandise does not constitute requisite evidence that a company producing [ ] is involved in the production of subject merchandise, let alone a “strong indication” that it is. IDM at 23.

Moreover, Commerce’s “strong indication” assumption is contrary to direct record evidence. *See* IDM at 23. First, Ecopure repeatedly stated in response to direct questions from Commerce that [ ] is not involved in subject merchandise in any way:

> Kindly refer to Exhibit SS-6 through Exhibit SS-10, Ecopure which clarify that [ ] are not involved in the manufacture, distribution, or supply of subject merchandise or an input product to Ecopure that is primarily dedicated to the production of subject merchandise.

Ecopure III SQR at 2 (**CR 41-55**); *see* Ecopure Affiliation SQR Exhibit FS-2(a) (**CR 123**).

Second, Commerce’s characterization of the scope of HTS [ ] is wrong. In fact, Ecopure’s organic soybean meal is classified in HTS code 2304.00.10 as “oil-cake and oil-cake

meal of soyabean, expeller variety." Ecopure III Affiliation QR Exhibit 22 (**CR 127**). Heading 2309, in contrast, is a residual basket subheading in which a wide variety of products which are not expressly provided for in prior Chapter 23 Headings (e.g., Heading 2304) are classified.[7] *Id.* Indeed, the scope of this Order expressly provides that:

> The products covered by this *Order* **are currently classified** under the following Harmonized Tariff Schedule of the United States (HTSUS) subheadings: 1208.10.0010 and **2304.00.0000**. Certified organic soybean meal **may also enter under** HTSUS 2309.90.1005, 2309.90.1015, 2309.90.1020, 2309.90.1030, 2309.90.1032, 2309.90.1035, 2309.90.1045, **2309.90**.1050, and 2308.00.9890. **The HTSUS subheadings and specifications are provided for convenience and customs purposes; the written description of the scope is dispositive**.

IDM at 3 (emphases added).

Thus, not only does the Order expressly provide that the scope of the Order is not defined by any HTSUS subheading, but HTSUS 2309.90, a residual, catch-all subheading, is referenced as a secondary subheading under which subject merchandise might be entered, as distinguished from a primary subheading under which organic soybean meal is specifically classified. *Id.* This

---

[7] Consistent with its heading description, 'Preparations of a kind used in animal feeding,' Commerce has applied Heading 2309 broadly to products not specifically provided for elsewhere in HTS Chapter 23. *See, e.g.*, *Monosodium Glutamate From the People's Republic of China: Final Determination of Sales at Less Than Fair Value and the Final Affirmative Determination of Critical Circumstances*, 79 Fed. Reg. 58,326 (Sep. 29, 2014), IDM Comment VI.6 ("The Department continues to find HTS 2309.90.2000 more accurately fits the description of Meihua's **OBP (organic bacterial protein)** by-product." (emphasis added)); *Certain Frozen Warmwater Shrimp From the People's Republic of China: Notice of Final Results and Rescission, in Part, of 2004/2006 Antidumping Duty Administrative and New Shipper Reviews*, 72 Fed. Reg. 52,049 (Sep. 12, 2007), IDM Comment 1 ("the Infodrive India data suggests the inclusion of **shrimp feed additives** under the HTS category, 2309.90.31." (emphasis added)); *Certain Frozen Fish Fillets from the Socialist Republic of Vietnam: Final Results of the Tenth Antidumping Duty Administrative Review; 2012-2013*, 80 Fed. Reg. 23,945 (Jan. 7, 2015), IDM Comment VII ("the HTS category proposed by HVG, HTS 2309.90.20, is a broad basket category that includes "**premixes, feed supplements, and feed additives for Animals**," which includes a variety of items that are not specific to vitamins, absorbic acid, and minerals. Furthermore, the description for HTS 2309, the main heading for this HTS category, represents "Food Industry Residues & Waste; Prep Animal Feed," indicating that derivatives from food industry residues and waste may also be included in this category." (emphasis added)).

was further confirmed by the United States International Trade Commission ("Commission") in its original investigation:

> Depending on the nature of the imported product, {organic soybean meal ("OSBM")} may also be reported under HTS statistical reporting numbers 2309.90.1005, 2309.90.1015, 2309.90.1010, 2309.90.1030, 2309.90.1032, 2309.90.1035, 2309.90.1045, 2309.90.1050, or 2308.00.9890. According to note 1 to chapter 23, "Heading 2309 includes products of a kind used in animal feeding, not elsewhere specified or included, obtained by processing vegetable or animal materials to such an extent that they have lost the essential characteristics of the original material, other than vegetable waste, vegetable residues and byproducts of such processing." Subheading 2309.90.10 covers mixed feeds or mixed feed ingredients, and 2308.00.98 covers miscellaneous vegetable forms of a kind used in animal feeding.

*Organic Soybean Meal from India*, Inv. Nos. 701-TA-667 & 731-TA-1559 (Final), USITC Pub. 5321 (Mar. 2022), at I-8 n. 12.

The Commission report further notes that "OSBM is used almost exclusively by the organic poultry industry (about 75 percent of OSBM consumption in the United States) and organic dairy industry (about 25 percent)." *Id*. at I-9. [ ] is for neither poultry nor dairy.

In light of these facts, the classification of [ ] in HTS 2309.90 does not constitute any indication, weak or strong, to support Commerce's presumption that [ ] produces subject merchandise. *See* IDM at 23. This HTS subheading typically covers non-subject merchandise and, when faced with Ecopure's repeated statements on the record that [ ] does not produce subject merchandise and absent any record evidence that [ ] is identical with the subject merchandise, Commerce's "strong indication" conclusion is clearly wrong. *See* IDM at 23.

Moreover, a finding of total AFA cannot be supported by a speculative "strong indication" of a fact without the respondent having been afforded the opportunity to rebut the presumption. *Id.*; § 1677m(d). In the instant case, Petitioner raised the Heading 2309 issue in its

comments on Ecopure's January 3, 2025, questionnaire response, and properly asked Commerce to ask Ecopure to "explain whether this product incorporates subject merchandise." Petitioner's Comments on Ecopure III SQR at 6 (**CR 39**). Commerce, however, never followed up with this simple question. Commerce also did not "promptly inform the person submitting the response of the nature of the deficiency" and did not, "to the extent practicable, provide that person with an opportunity to remedy or explain the deficiency in light of the time limits established for the completion of investigations or reviews under this subtitle." *See* § 1677m(d). In this case, Petitioner's comments were filed on January 16, 2025, and Commerce had five months until its Preliminary Results to obtain information needed to investigate this issue. *See* Petitioner's Comments on Ecopure III SQR (**CR 39**). Commerce, however, failed to ask Ecopure whether [ ] is subject merchandise.

In sum, Commerce's conclusion that Ecopure's questionnaire responses were unreliable, was not supported by substantial evidence, insofar as Commerce's reliability conclusion was based on the facts that: (1) in its initial questionnaire response, Ecopure inadvertently failed to report [ ] and did not report affiliates in which Ecopure had no ownership interests; and (2) another Ecopure affiliate produced merchandise classified in a basket HTSUS subheading listed in the CVD Order. *See* IDM at 23. These facts do not constitute sufficient reason to reject all of the information submitted by Ecopure and to rely on total AFA in their place.

## IV. 19 U.S.C. § 1677m(d) PROHIBITS COMMERCE FROM RELYING ON TOTAL AFA WITHOUT PROVIDING ECOPURE WITH THE OPPORTUNITY TO CURE THE DEFICIENCIES UPON WHICH COMMERCE RELIED

Prior to applying facts available, "Commerce must 'promptly inform the person submitting the response of the nature of the deficiency and shall, to the extent practicable,

provide that person with an opportunity to remedy or explain the deficiency.'" *See Saha Thai Steel Pipe Pub. Co. v. United States*, 605 F. Supp. 3d 1348, 1361 (CIT 2022) (quoting § 1677m(d)). In this regard:

> To provide adequate notice under § 1677m(d), Commerce must give the respondent "{c}larity regarding what information is requested by Commerce . . . especially in cases such as this where there was confusion as to whether or not requests for data were made and whether or not these requests were refused." *Hitachi Energy*, 34 F.4th at 1384 (quoting *SKF USA*, 391 F. Supp. 2d at 1336).

*Id.* at 1369.

The statutory entitlement to notice and an opportunity to cure is "unqualified," regardless of when Commerce discovers the deficiency. *TNC Kazchrome JSC v. United States*, No. 25-00128, 2026 WL 2668862, at *1 n.2 (CIT Sept. 10, 2026) (quoting *Hitachi Energy USA Inc. v. United States*, 34 F.4th 1375, 1384 (Fed. Cir. 2022)). A supplemental questionnaire satisfies Section 1677m(d) only where it specifically identifies the deficient response and requests clarification. *See NSK Ltd. v. United States*, 481 F.3d 1355, 1360 n.1 (Fed. Cir. 2007). A generic request for "additional information" does not suffice. *Id.* at 4-5 (citing *NSK Ltd. v. United States*, 481 F.3d 1355, 1360 n.1 (Fed. Cir. 2007)). Without a proper, direct request, Commerce does not have sufficient reason to rely on total AFA. *See Ta Chen Stainless Steel Pipe v. United States*, No. 97-08-01344, 1999 WL 1001194, at *15 (CIT Oct. 28, 1999) (explaining Commerce's "obligation to let the respondent know what information it really wants" before AFA can be applied (citing *Queen's Flowers de Colombia v. United States*, 981 F. Supp. 617, 628 (CIT 1997)); *Saha Thai*, 605 F. Supp. 3d at 1365 ("The law requires respondents to be diligent, not clairvoyant."); *Sigma Corp. v. United States*, 841 F. Supp. 1255, 1267 (CIT 1993) ("Commerce cannot expect a respondent to be a mind-reader.").

In this case, Commerce accepted Ecopure's January 3, 2025, response, and did not notify

Ecopure that the response was deficient or provide Ecopure with "an opportunity to remedy or explain the deficiency." § 1677m(d). Indeed, Petitioner asked Commerce to ask Ecopure additional questions regarding its affiliates. *See* Petitioner's Comments on Ecopure III SQR at 6-8 (**CR 39**). Commerce, however, did not take Petitioner's advice. *See id.* Instead, Commerce did nothing for five and a half months before it issued its preliminary decision relying on total AFA for deficiencies in reporting affiliates and another eight and a half months before the Final Decision. *See Hyundai*, 485 F. Supp. 3d at 1388 (finding Commerce's use of AFA not in accordance with law when "Commerce received the deficient response **two months** before the Preliminary Results and the agency provides no basis for finding that it was not practicable to have provided the respondent an opportunity to remedy or explain the deficiency" (emphasis added)). This reliance, without requesting an explanation, is contrary to law. *Id.*

Commerce does not dispute the fact that it never asked Ecopure about any of the specific alleged deficiencies which led Commerce to rely on total AFA. *See* IDM at 23. Instead, Commerce reasoned that "one supplemental questionnaire is enough" and that any further request regarding specific entities would be "premature." *Id.* But Commerce's claim that it is not required to issue repetitive questionnaires presupposes a first, specific request, which Commerce never made. *Id.* Nothing in § 1677m(d) permits Commerce to excuse its own silence by deeming that notice is futile. *See Hitachi Energy*, 34 F.4th at 1384; *Kazchrome*, 2026 WL 2668862, at *3. In other cases, Commerce has made repeated requests for specific information before rejecting all information. *See, e.g., Mukand, Ltd. v. United States*, 767 F.3d 1300, 1306 (Fed. Cir. 2014) ("In each of the supplemental questionnaires, Commerce explained why it was unsatisfied with Mukand's response and reiterated both the type of information it needed and why it was important. Commerce even went so far as to provide Mukand with a sample chart to complete

and encouraged Mukand to reach out if it needed assistance or additional clarification."). Commerce should have followed that policy in this case. *See id.* Its failure to do so constitutes reversible legal error.

In sum, Commerce's failure to allow Ecopure to explain and correct its inadvertent errors, leading to a 75.48% subsidy rate, renders its reliance on total AFA contrary to law.

## V. ECOPURE'S ERRORS WERE NOT SUFFICIENTLY EGREGIOUS TO ALLOW COMMERCE TO RELY ON THE EXTRAORDINARY REMEDY OF TOTAL AFA

Commerce cannot apply total AFA unless the record supports a finding that the respondent, both objectively and subjectively, failed to act to "the best of its ability" to cooperate with Commerce's requests for information, and thus, that reliance on AFA was needed to encourage future cooperation. *See* § 1677m(e)(4); *Mannesmannrohren-Werke AG v. United States*, 77 F. Supp. 2d 1302, 1316 (CIT 1999).

Total AFA applies when Commerce determines that all of a respondent's reported information is unreliable or unusable and the respondent's failure to cooperate warrants an adverse inference as to the entire record. *See Zhejiang*, 652 F.3d at 1348 (citing *Steel Authority of India, Ltd. v. United States,* 149 F. Supp. 2d 921, 928-29 (CIT 2001)). In *National Nail Corp. v. United States*, this Court reasoned:

> {I}n order to apply "total {AFA}," Commerce must first find, based on the record, that the use of facts available is warranted with respect to all requested information. The absence of any usable information, however, is a necessary, but not sufficient, condition for the application of "total {AFA}." Before Commerce may apply total {AFA}, the record must support a finding that the respondent, both objectively and subjectively, failed to act to "the best of its ability" to cooperate with Commerce's requests for information, and that thus, the use of {AFA} was needed to encourage future cooperation.

390 F. Supp. 3d 1356, 1375 (CIT 2019).

In *China Steel Corp. v. United States*, this Court discussed total AFA in a similar manner.

> The question of whether a respondent has cooperated to the "best of its ability" is case-specific, and an AFA rate is not based on the conduct of a "hypothetical, well-resourced respondent." The Federal Circuit has held that "Commerce should consider the overall facts and circumstances of each case, including the level of culpability" and "'the seriousness of the type of misconduct' committed by the uncooperative party" before applying AFA.

393 F. Supp. 3d 1322, 1336-37 (CIT 2019) (citations omitted).

Reliance on total AFA is not appropriate when that decision is "speculative in light of the record, which demonstrated that most of {the proffered} price information was reliable." *Hyundai Elec. & Energy Sys. v. United States*, Case No. 2021-2312, 2022 WL 3273811, at *4 (Fed. Cir. Aug. 11, 2022). While application of AFA does not require "evidence of bad faith on the part of a respondent," it does require that Commerce consider the reasons why a respondent failed to act to the best of its ability. IDM at 6. In *Mannesmannrohren-Werke AG v. United States*, this Court reasoned:

> A respondent can fail to respond because it was not able to obtain the requested information, did not properly understand the question asked, or simply overlooked a particular request. Thus, without further explanation by Commerce, the Court will not infer that a respondent's failure to respond constitutes substantial evidence that it failed to cooperate to the best of its ability. **This is especially true where, as here, a respondent sought to correct its deficiencies in responding to a supplemental questionnaire.**

77 F. Supp. 2d 1302, 1316 (CIT 1999) (emphasis added).

In *Fujian Machinery & Equipment Import & Export Corp. v. United States*, this Court discussed the significance of a respondent's willfulness, or lack thereof, in Commerce's decision to rely on AFA:

> {W}here {Commerce} cannot demonstrate such willfulness, it must tread especially carefully. The more complex the review, the greater the need for such restraint. "{A} completely errorless investigation is simply not a reasonable expectation. Even the most diligent respondents will make mistakes, and Commerce must devise a non-arbitrary way of distinguishing among errors."

178 F. Supp. 2d 1305, 1334 (CIT 2001) (citations omitted); *see Guizhou Tyre Co. v. United States*, 348 F. Supp. 3d 1261, 1270 (CIT 2018) ("To apply AFA solely to deter non-cooperation or 'simply to punish'—would make the agency's determination based on an incomplete (and therefore, inaccurate) account of the record; that is a fate this court should sidestep.").

Here, Commerce's reliance on total AFA should be reversed. *See Nat'l Nail Corp.*, 390 F. Supp. 3d at 1375; *Fujian*, 178 F. Supp. 2d at 1334; *Mannesmannrohren-Werke*, 77 F. Supp. 2d at 1316; *Zhejiang*, 652 F.3d at 1348. Ecopure answered every questionnaire on time, submitted more than 300 exhibits, and certified their accuracy. *See* Ecopure III SQR at 9 (**CR 41-55**). When Ecopure discovered that it had failed to include affiliates in which it had no ownership interest in its affiliation chart, Ecopure corrected the record "without solicitation" in its January 3, 2025, response—five and a half months before the Preliminary Results. IDM at 19; Ecopure III SQR at 3 (**CR 41-55**). That is precisely the conduct the Court described in *Mannesmannrohren-Werke* as not justifying reliance on total AFA: a respondent that "sought to correct its deficiencies in responding to a supplemental questionnaire." 77 F. Supp. 2d at 1316. Commerce made no finding that Ecopure acted willfully; its speculation that Ecopure's conduct "can be viewed as purposeful deflection," is belied by the record. *See* IDM at 21. Where Commerce "cannot demonstrate such willfulness, it must tread especially carefully." *Fujian*, 178 F. Supp. 2d at 1334. Rather than treading carefully, Commerce treated Ecopure's voluntarily corrected omission as grounds to discard all of Ecopure's submissions. *See AG Der Dillinger Huttenwerke v. United States,* 140 F.4th 1364, 1371 (Fed. Cir. 2025) (Commerce may apply adverse inferences "only under circumstances in which it is reasonable for Commerce to expect that more forthcoming responses should have been made"). Thus, Commerce's reliance on total AFA is contrary to law.

Commerce's ultimate conclusion rests on its view that Ecopure's "consistently inconsistent affiliation reporting resulted in an informational gap given the conflicting pieces of evidence with respect to affiliation on the record." IDM at 20. That evidence may be inconsistent does not mean that evidence is missing from the record or that a respondent did not act to the best of its ability. *See Nat'l Nail Corp.*, 390 F. Supp. 3d at 1375. Commerce is required to resolve any inconsistencies, by asking additional questions. *See* § 1677m(d). In this case, Commerce had more than enough time to resolve inconsistencies. *See id.* Its failure to do so precludes Commerce from relying on total AFA.

Commerce never asked for confirmation, nor found that any of the subsidy information Ecopure reported was unreliable or unusable. *See Zhejiang DunAn*, 652 F.3d at 1345. Total AFA is reserved for situations "where none of the reported data is reliable or usable," and Commerce may not use facts available "to do more than fill the actual gap in the record." *Id.* Moreover, Commerce identified no affiliate not previously disclosed by Ecopure that is in fact cross-owned, finding only that it was "unable to confirm" the point. IDM at 22.

Ecopure responded to all Commerce questionnaires in a timely manner, submitting voluminous documentation in support of its position. *See* Ecopure III SQR (**CR 41-55**). Ecopure has certified as to the accuracy of its responses and Commerce has not questioned the integrity of any of the data provided, with the sole, inexplicable exception of rejecting all data submitted merely because Ecopure did not report all affiliates in its initial October 15, 2024, submission. *See id.* at 9. Significantly, Ecopure did not have any ownership interest in these "unreported" affiliates, most of whom were located outside of India. *See* IDM at 22; Ecopure III SQR Exhibits SS-11, SS-12, SS-13 (**CR 41-55**). The absence of ownership and location outside of India constitute a reasonable explanation as to why Ecopure omitted these companies in the initial

response. *See* Ecopure III SQR Exhibits SS-11, SS-12, SS-13 (**CR 41-55**). Indeed, Petitioner suggested that Commerce ask Ecopure the reason for its mistake; but rather than accepting this reasonable suggestion, Commerce penalized Ecopure for not including these companies on its initial list. Ecopure's mistakes were not egregious and were corrected five and a half months prior to Commerce's Preliminary Results. 90 Fed. Reg. at 25,995 (**PR 36**). Accordingly, Ecopure's errors in its initial response were not sufficiently egregious to allow Commerce to rely on total AFA.

## VI. COMMERCE DEPARTED FROM ITS ESTABLISHED PRACTICE AND ALSO TREATED ECOPURE DIFFERENTLY FROM TEJAWAT WITHOUT ADEQUATE EXPLANATION

Respondents in antidumping duty ("ADD") and CVD cases routinely make mistakes in reporting all affiliates in their initial affiliation responses, which in CVD cases are due merely two weeks after receipt of a questionnaire. *See Fujian*, 178 F. Supp. 2d at 1334 (citing *Nippon Steel Corp. v. United States*, 146 F. Supp. 2d 835, 841 n. 10 (CIT 2001)). Respondents then often report additional affiliates in subsequent responses and Commerce routinely accepts these responses, without objection from petitioners.[8] In many cases these simple revisions are not

---

8 Commerce routinely accepts supplemental responses identifying previously unreported affiliates, declining to apply AFA where the respondent corrects the omission before verification. *See Emulsion Styrene-Butadiene Rubber from the Russian Federation: Final Affirmative Determination of Sales at Less than Fair Value and Classification of the Russian Federation as a Non-Market Economy*, 87 Fed. Reg. 69,002 (Nov. 17, 2022), IDM Comment 3 ("SIBUR further explained that it initially overlooked Company A during its internal query to identify affiliates involved in the production of ESBR because Company A is a joint venture with a third party . . . . In contrast, in *POS Cookware from China*, the respondent failed to disclose its affiliation with an entity that Commerce discovered at verification. Similarly, in *Innersprings from China*, the respondent repeatedly misled Commerce regarding its affiliate's involvement in the sale of subject merchandise; in contrast, here, SIBUR reported Company A's involvement in the production of SIBUR's ESBR prior to verification and no information contradicting SIBUR's responses regarding Company A's operations was found at verification."); *Certain Stainless Steel Butt-Weld Fittings from Taiwan: Final Results and Final Rescission in Part of*

documented in a formal comment in an IDM.

Since Commerce has not adequately explained the reason why it did not follow this precedent in this case, Commerce's Final Decision is contrary to law. *See SKF USA Inc. v. United States*, 35 CIT 1432, 1433 (2011) ("Because the Court of Appeals grounded its reversal of the CIT in the inadequacy of Commerce's explanation of the change in practice, rather than disallow the change in practice *per se,* the court orders a remand under which Commerce must reconsider its decision and address, at a minimum, the two significant concerns raised by plaintiffs."). Moreover, in this case, Commerce treated Ecopure and Tejawat differently. Commerce did not ask Ecopure for further information after the agency received Ecopure's supplemental questionnaire response on January 3, 2025. In contrast, on January 23, 2025, Commerce asked the second mandatory respondent, Tejawat, to provide additional information regarding changes in Tejawat's initial affiliation response. *See* Section III Supplemental Questionnaire to Tejawat at 1 (**CR 29**). Tejawat responded to Commerce's questions on February 10, 2025, apologizing for its reporting error. Tejawat III SQR at 11 (**CR 23-26**). On May 15, 2025, Commerce issued another supplemental questionnaire to Tejawat, Section III Second Supplemental Questionnaire to Tejawat (**CR 20**), to which the company replied on May 20, 2025. Tejawat III 2SQR (**CR 16-18**).

In *Grupo Acerero S.A. de C.V. v. United States*, this Court held that similar action by

---

*Antidumping Duty Administrative Review*, 70 Fed. Reg. 1870 (Jan. 11, 2005), IDM Comment 3 ("Notwithstanding Ta Chen's lack of promptness in submitting information to the Department, the breadth of the information submitted was accepted by the Department as sufficient for making a determination."); *MLWF from China,* 88 Fed. Reg. 42,293, IDM Comment 1 ("We disagree that Fuerjia failed to provide such information in a timely manner. We received Fuerjia's Second SQR on September 13, 2022, and Fourth SQR on October 21, 2022, and we were able to fully analyze these submissions prior to publication of the *Preliminary Results* on December 28, 2022.)

Commerce was an abuse of discretion. 698 F. Supp. 3d 1320, 1333 (CIT 2024).

> Commerce abused its discretion when it denied Simec's September 7 extension request. It cut Simec out of the fact-gathering portion of the review well before releasing the Preliminary Results while continuing to issue Deacero multiple supplemental questionnaires and time extensions. *Cf. SKF USA Inc. v. United States*, 263 F.3d 1369, 1382 (Fed. Cir. 2001) (quoting *Transactive Corp. v. United States*, 91 F.3d 232, 237 (D.C. Cir. 1996)) ("{I}t is well-established that 'an agency action is arbitrary when the agency offer{s} insufficient reasons for treating similar situations differently.'") (second alteration in original). Although Simec and Deacero both proffered COVID-19 restrictions as justification for their extension requests, Simec faced more acute challenges. Nonetheless, Commerce denied Simec's September 7 extension request, continued to request and accept information from Deacero until November 10, and did not publish its Preliminary Results until December 3.

*Id.* (citations omitted); *see also Nucor Corp. v. United States*, 653 F. Supp. 3d 1295, 1310 (CIT 2023) ("Commerce's differential treatment of Pohang SRDC and Plantec appears arbitrary."); *SKF USA Inc. v. United States*, 263 F.3d 1369, 1382 (Fed. Cir. 2001) (stating that it is "well-established that an agency action is arbitrary when the agency offer{s} insufficient reasons for treating similar situations differently").

Commerce dismissed the precedent on which Ecopure relied as to the existence of a practice because it arose in ADD proceedings, reasoning that affiliation information is uniquely important early in a CVD proceeding. IDM at 21-22. But Commerce identified no reason why the timing of affiliate reporting should be treated differently in CVD than in ADD proceedings. In fact, in ADD proceedings, affiliates must be reported in a mandatory respondent's initial Section A questionnaire response and Commerce's need to correctly identify all affiliates is no less important than it is in a CVD case. *See, e.g.*, § 1677a(a)-(b) (affiliation critical in determining whether U.S. price should be based on export price or constructed export price); § 1677b(f)(3) (major input rule only applies in transactions between affiliated parties); 19 C.F.R. § 351.401(f) (affiliation is a threshold consideration for collapsing two entities).

Moreover, Ecopure submitted its corrected data on January 3, 2025, which was five and a half months before Commerce's Preliminary Results. 90 Fed. Reg. at 25,995 (**PR 36**). Yet, Commerce did not explain why it could not simply have asked Ecopure about the affiliates it disclosed, as Petitioner requested. *Id.*

Finally, Commerce's attempts to distinguish its treatment of Ecopure and Tejawat are unpersuasive. IDM at 23. Commerce noted that it held an ex-parte meeting with Ecopure but not Tejawat, and that its additional questionnaire to Tejawat "did not include any questions related to affiliation." *Id.* But Commerce's meeting took place early in the proceeding before Ecopure filed any of the responses Commerce now faults. And Commerce's January 23, 2025, supplemental questionnaire asked Tejawat to explain a change between its affiliation response and its initial questionnaire response, and to state whether eight suppliers were "unaffiliated or affiliated with Tejawat." *See* Section III Supplemental Questionnaire to Tejawat at 4 (**CR 29**). Commerce gave Tejawat an opportunity to explain a change in its affiliation reporting. *Id*. It gave Ecopure none.

## CONCLUSION

For the foregoing reasons, Ecopure respectfully requests that this Court order a remand for Commerce to reconsider its Final Results and recalculate Ecopure's CVD rate.

Respectfully submitted,

*/s/ Ned H. Marshak*
Ned H. Marshak*
Dharmendra N. Choudhary
Andrew T. Schutz

GRUNFELD, DESIDERIO, LEBOWITZ,
SILVERMAN & KLESTADT LLP

1201 New York Ave., NW, Suite 650
Washington, DC 20005
(202) 783-6881

*599 Lexington Ave., 36th Floor

New York, NY 10022
(212) 557-4000

*Counsel for Plaintiff*
*Ecopure Specialties Ltd.*

Dated: October 30, 2026

## **CERTIFICATE OF COMPLIANCE**

Pursuant to Chamber Procedure 2(B)(1), the undersigned certifies that this brief complies with the word limitation requirement. The word count for Plaintiffs' Memorandum of Law In Support of its 56.2 Motion, as computed by Grunfeld, Desiderio, Lebowitz, Silverman & Klestadt's word processing system, Microsoft Word 2013, is 12,989 words, less than the 14,000 word limit.

*/s/ Ned H. Marshak*
Ned H. Marshak

*Counsel for Plaintiff*
*Ecopure Specialties Ltd.*

Dated: October 30, 2026